Albert G. Wade, II and Maria L. Wade v. Commissioner.
Wade v. Commissioner
Docket No. 84070.
United States Tax Court
T.C. Memo 1963-50; 1963 Tax Ct. Memo LEXIS 293; 22 T.C.M. (CCH) 190; T.C.M. (RIA) 63050; February 20, 1963
*293 Held, the advances made by petitioner to a corporation engaged in the business of representing radio and television stations were proximately related to his advertising business and deductible in the years 1953 and 1954 as business bad debts. William P. Rosenthal, Esq., 10 S. Dearborn St., Chicago, Ill., for the petitioners. Helen A. Viney, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioners' income tax for the taxable years 1953, 1954, 1955 and 1956 in the respective amounts of $45,127.68, $44,604.08, $59,880.02 and $107,346.52. *294 All of the issues raised by the pleadings have been disposed of by agreement of the parties except the issue of whether bad debt losses in the amounts of $47,000 and $32,504.16, sustained by Albert G. Wade, II during the taxable years 1953 and 1954 are nonbusiness bad debt losses within the meaning of section 23(k) of the Internal Revenue Code of 1939 and section 166 of the Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Albert G. Wade, II, hereinafter sometimes referred to as the petitioner, and Maria L. Wade are husband and wife who, during the taxable years in question, resided in River Forest, Illinois. They filed joint income tax returns on the cash receipts and disbursements basis with the district director of internal revenue at Chicago, Illinois. Geoffrey Wade Advertising was an advertising agency engaged in the business of placing advertising with the various media of public communications, including television stations, radio stations, newspapers and periodicals. The business was organized by petitioner's grandfather as a sole proprietorship. Upon his retirement and until *295 1951 the business was operated by petitioner's father, who died in January 1951. Upon the death of petitioner's father, the business was reorganized as a partnership with petitioner assuming the position of managing partner. The remaining partners in the agency were petitioner's mother and sister, neither of whom was active in the business. When petitioner took over control and management, the agency's major account was Miles Laboratory. This client accounted for approximately 85 per cent to 90 percent of the agency billings. Petitioner was acquainted with George W. Clark who, for the three or four years immediately prior to December 1951, was an employee of a company selling time for radio and television stations. Prior to December 1951, George W. Clark and petitioner discussed the possibility of organizing a corporation to be engaged in representing radio and television stations and selling time thereon to advertisers and advertising agencies. On December 19, 1951, George W. Clark, Inc., hereinafter sometimes referred to as Clark, Inc., an Illinois corporation, was organized for this purpose. It had an initial capitalization of $10,000 consisting of 100 shares of common stock *296 with a par value of $100 per share. All of said shares were issued to petitioner for $10,000 in cash. Pursuant to an agreement with George W. Clark, petitioner gave him 50 percent of the stock of Clark, Inc. as a gift without consideration. Petitioner also agreed that George W. Clark could buy the remaining 50 percent of the shares of Clark, Inc. from petitioner at book value at any time thereafter. Petitioner went into this venture with George W. Clark in the hope and expectation of aiding, broadening, and diversifying, the business of Geoffrey Wade Advertising. It was understood and agreed between petitioner and George W. Clark that George W. Clark would, whenever possible, furnish petitioner with leads which came to the attention of Clark, Inc. for new advertisers seeking advertising agency representation or seeking to change their agency representation. It was also understood and agreed that petitioner would be furnished with information that came to the attention of Clark, Inc. as to advertising campaigns of advertisers; activities of radio and television stations represented by Clark, Inc., as well as other stations, and time availabilities for advertising on radio and television *297 stations before such information became a matter of public knowledge. George W. Clark was president and the chief operating officer of Clark, Inc. Petitioner was neither a director nor officer of Clark, Inc. Petitioner did not receive any compensation or expense allowance from Clark, Inc.
Because Clark, Inc. did not secure representation of certain stations as had been anticipated, the business of Clark, Inc. did not progress favorably and the corporation incurred losses during the years 1952 and 1953 From time to time petitioner made loans to the corporation evidenced by promissory notes bearing interest at the rate of 2 1/2 percent. The following tabulation shows the amount of money loaned to Clark, Inc. by petitioner and the dates said loans were made: Date
Amount
3- 7-52
$10,000
4-30-52
10,000
7- 1-52
10,000
8-25-52
5,000
9-18-52
2,000
10-13-52
5,000
11- 3-52
5,000
12- 2-52
5,000
12-31-52
5,000
1-20-53
5,000
2-17-53
2,000
2-24-53
1,000
3- 2-53
2,000
3-17-53
2,000
3-26-53
1,000
4- 1-53
1,000
4-14-53
2,000
4-22-53
4,000
Total
$77,000
The operations of Clark, Inc. continued to be unprofitable, and, on May 15, 1953, General *298 Teleradio Incorporated of New York purchased all of the outstanding shares of stock of Clark, Inc. for $1,000. This corporation owned and operated a network of radio stations. At the time of the purchase of the stock and pursuant to an agreement with General Teleradio Incorporated, petitioner forgave and cancelled $47,000 of the $77,000 of indebtedness then due and owing to him from Clark, Inc. George W. Clark continued to operate the business after the stock purchase by General Teleradio Incorporated. Upon the cancellation of the indebtedness, the $47,000 was transferred on the books of Clark, Inc. from Notes Payable to Paid-In Surplus. After the purchase of the stock of Clark, Inc., that corporation continued its operations until July 1954, at which time it went out of business and ceased all operations. The only assets remaining after the termination of the business were furniture, typewriters and other similar items which were sold and the proceeds thereof used to pay back salaries and withholding taxes. In 1954 Clark, Inc. failed to pay its franchise tax and the Illinois Secretary of State issued a warrant to the Cook County Sheriff directing the Sheriff to institute dissolution *299 proceedings against Clark, Inc. forthwith, and the corporation was subsequently dissolved by court order. Before the end of 1954 Clark, Inc. was out of business and had no assets. Petitioner did not receive any repayment on the $30,000 still due and owing to him from Clark, Inc.
Prior to the time Clark, Inc. went out of business, it borrowed the sum of $2,500 from the National Boulevard Bank of Chicago. Petitioner signed the note given to secure this loan. When Clark, Inc. went out of business in 1954 and failed to pay the bank. petitioner, as co-signer, became obligated to pay and did pay the sum of $2,504.16 to the National Boulevard Bank of Chicago. No part of this amount was repaid to petitioner. On his income tax returns for 1953 and 1954 Wade took deductions for business bad debts which included the advancements to Clark, Inc. in the amounts of $47,000 in 1953 and $30,000, plus $2,504.16 (mentioned above in the transaction where Wade was co-signer on the note of Clark, Inc. to the bank) in 1954. Respondent, in his notice of deficiency, determined these losses were "from the worthlessness of non-business bad debts as defined in section 23(k)(4) of the Internal Revenue *300 Code of 1939 and section 166(d) of the Internal Revenue Code of 1964." [1]
Opinion Petitioner incurred bad debt losses in the years 1953 and 1954 in the amounts of $47,000 and $32,504.16, respectively. The only issue is whether the losses resulted from nonbusiness bad debts as respondent determined. Section 166(d)(2)(A) of the Internal Revenue Code of 1954, which is substantially similar to section 23(k)(4) of the 1939 Code, as here applicable, defines the term "nonbusiness debt" as meaning a debt other than "a debt created * * * in connection with a trade or business of the taxpayer * * *." It is petitioner's contention here that the debts in question were created in connection with his trade or business and hence were not nonbusiness losses. Petitioner, during all of the years here involved, was the managing partner of an advertising agency. This partnership agency was actively engaged in placing advertising with *301 various media of public communications, including television and radio stations, and periodicals and newspapers. The business of an active managing partner is that of the partnership. S. E. Maitland Brenhouse, 37 T.C. 326. The question is therefore reduced to whether the debts here involved were created "in connection with" petitioner's business of conducting an advertising agency. The question is essentially a question of fact. J. T. Dorminey, 26 T.C. 940; Income Tax Regs. § 1.166-5(b)(2). The debts, which were incurred in 1952 and 1953, were to George W. Clark, Inc., a corporation petitioner and Clark had organized in 1951 for the purpose of representing radio and television stations and selling time thereon to advertisers or advertising agencies. The loans were to keep George W. Clark, Inc. in business until it could secure the radio representation it was expecting. We feel it is quite well established by the evidence that petitioner went into the venture of organizing George W. Clark, Inc. with the primary motive of broadening and helping his advertising business. If George W. Clark, Inc. had progressed favorably as planned, *302 petitioner would have had an excellent source of leads for new advertising agency representation. Radio and television station representatives learn early of advertisers who are contemplating changing their advertising agencies. The record here shows that in the short life of George W. Clark, Inc. it was able to furnish petitioner with a few such leads. While petitioner was not successful in landing such accounts, he did solicit them. One such account, where petitioner was allowed to make a full scale presentation, involved billings estimated at half a million dollars a year. Petitioner did not obtain the account but if he had been successful it would have resulted in a net profit to his advertising agency of around $50,000 a year. In view of petitioner's situation where 85 percent to 90 percent of his advertising business was derived from one client, it seems natural that petitioner might enter a venture that could be likely to increase his clientele. In addition to obtaining "leads" for prospective advertising clients, petitioner, through his association with Clark, Inc., would be kept informed of advertising campaigns of other advertisers, including those in competition with clients *303 of petitioner's advertising agency. One piece of information valuable to petitioner's advertising business that George W. Clark, Inc. could furnish would be what is called time availabilities for radio and television advertising as soon as nine spots became available and before such knowledge was known generally amongst advertising agencies. The record rather indicates petitioner could not have expected much direct profit from the George W. Clark, Inc. venture. Petitioner was not an officer of that corporation and he drew no compensation from it There was no agreement that he would ever receive any compensation and he was paid no expenses by the corporation. The loans he made to the corporation were at the rate of 2 1/2 percent interest and his stock was subject to George W. Clark's right to buy it at any time at book value. Petitioner's income from his advertising agency in 1953 and 1954 was $204,345.12 and $235,792.24, respectively. He testified he had other investments and he would not have entered the Clark transaction for any potential profit he might make on the sale of the stock or profit in the form of interest on the loans he made to keep the corporation in business. We *304 believe his testimony to the effect that his Clark, Inc. venture was in connection with and designed to aid, his advertising business. The statute defines a nonbusiness debt as one other than one incurred in connection with petitioner's business. Most of the authorities deciding issues under this statute, where there is no contention taxpayer is in the business of loaning money, state the rule of the statute affirmatively: that a business bad debt loss results from the worthlessness of a loan made to benefit the taxpayer's business or that is proximately related to the taxpayer's business. We feel petitioner's contention should be sustained under such cases as Stuart Bart, 21 T.C. 880; S. E. Maitland Brenhouse, supra; J. T. Dorminey, supra; and Wilfred J. Funk, 35 T.C. 42. The case is quite like the Brenhouse case. There the taxpayer was a partner in a business that designed and sold display devices. His loans to an industrial photograph company, under an arrangement whereby petitioner would be introduced to its customers who were also display buyers, were held business loans because to enlarge the partnership's display business. *305 Under all of the evidence we are convinced petitioner made the loans here involved in connection with his advertising business because of anticipated benefits that would accrue to his advertising business. We hold for petitioner on the issue presented. Because of stipulated concessions, Decision will be entered under Rule 50. Footnotes
1. Respondent actually determined the nonbusiness bad debt loss in 1954 was $30,000 and the $2,504.16 was allowed as a nonbusiness bad debt loss in 1956. Respondent now admits the bad debt loss in 1954 was $32,504.16.↩